UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>CHASE CUSTOM HOMES & FINANCE, INC.<br><br>Debtor. | Chapter 11<br>Case No. 23-20032 |
| JEFFREY P. ZAMBONI<br><br>Plaintiff/Defendant<br><br>v.<br><br>CHASE CUSTOM HOMES & FINANCE, INC.<br><br>Defendant/Plaintiff. | Adv. Proc. No. 23-02002 |

## MEMORANDUM OF DECISION

This matter came before the Court on claims asserted by and between Chase Custom Homes & Finance, Inc. ("Chase") and Jeffrey P. Zamboni, arising out of a home construction contract. Specifically, at trial, Mr. Zamboni pressed claims alleged in his Complaint for breach of contract (Count I), violation of Maine's Home Construction Contracts Act, 10 M.R.S. § 219-A, *et seq.* (the "HCCA") (Count IV), and violation of Maine's Unfair Trade Practices Act (the "UTPA") (Count V). For its part, Chase proceeded to trial on claims alleged in its Complaint for breach of contract and violation of Maine's Prompt Payment Act (the "PPA") (Count I), unjust enrichment (Count II), and quantum meruit (Count III).

For the reasons set forth more fully below, the Court will enter judgment in favor of Mr. Zamboni on Counts I, IV and V of his Complaint and will enter judgment in favor of Chase on Count III of its Complaint.[1]

## I.    Procedural History

On September 30, 2020, Chase commenced civil suit against Mr. Zamboni in York County Superior Court (Case No. RE-20-47) asserting claims of breach of contract and violation of the PPA, unjust enrichment, quantum meruit, and a lien count.  The same day, Mr. Zamboni filed his own complaint against Chase in Cumberland County Superior Court (CV-20-434).  Mr. Zamboni's complaint sought damages from Chase for breach of contract, fraud, negligent misrepresentation, violation of the HCCA, violation of the UTPA, and negligence.  In answering the opposing party's complaint, each party asserted as counterclaims the claims pled in their respective complaints.

In January of 2021, the cases were transferred to the Maine Business and Consumer Court (the "Business Court"), where they were assigned docket numbers BCD-CIV-2021-06 and BCD-REA-2021-02.  The Business Court consolidated the cases on March 17, 2021.

On February 15, 2023, Chase filed a petition for relief under chapter 11 of the United States Bankruptcy Code and on April 5, 2023 counsel for Chase filed a suggestion of bankruptcy with the Business Court.  Chase removed the consolidated cases to this Court pursuant to 28 U.S.C. §§ 157(b) and 1452 and D. Me. Local Rule 83.6.  On September 13, 2023, Judge Michael A. Fagone recused himself from the adversary proceeding and Judge Peter G. Cary was assigned.  Judge Fagone continues to preside over the underlying chapter 11 case.

During four days of trial held in late April and early May of 2024, the Court heard testimony from seven fact witnesses and two experts and admitted 107 documents into evidence. Following the

---

[1] To the extent that Mr. Zamboni initially pled in his Complaint additional claims for fraud (Count II), negligent misrepresentation (Count III), and negligence (Count VI) and Chase pled in its Complaint a lien count (Count IV), the Court deems these counts waived based on the parties' failure to address them in their post-trial briefs.

close of testimony, the parties submitted proposed findings of fact and conclusions of law and responses thereto.  The Court then took the matter under advisement.

## II.      Findings of Fact

The Court hereby finds that the preponderance of the credible evidence establishes the following relevant facts:

A.  Pre-Construction

1.       In 2014, Mr. Zamboni inherited Lot #5 on Portland Avenue, Old Orchard Beach, where he planned to build a home.

2.       Mr. Zamboni planned to include an in-law apartment so he could earn extra income and take advantage of a tax benefit.

3.       That same year, Mr. Zamboni hired an individual named Al Frick to design a septic system using an "Eljen" system (the "Frick Septic Design"), which the Town of Old Orchard Beach (the "Town") approved.

4.       In May of 2018, Mr. Zamboni met with Jim Fox, a Sales Manager for Chase, at Chase's office to discuss construction of his home.

5.       In his capacity as Sales Manager, Mr. Fox met with clients, reviewed changes to plans, drafted contracts, and acted as a liaison between the client and the project manager during the construction process.

6.       During this initial meeting, Mr. Zamboni stated that he wanted the septic system to be constructed in accordance with the Frick Septic Design.

*i.   The 9/11/18 Plan and the Marked-Up 9/11/18 Plan*

7.       Mr. Zamboni and Mr. Fox met again in September 2018, at which time they were joined by Jim McNulty, a designer hired as an independent contractor by Chase.

8.      During that meeting, Mr. Zamboni told Mr. Fox and Mr. McNulty that he wanted a two-sided gas fireplace, a butler's pantry, a porch on the back of the house and one large bedroom to allow for an in-law apartment (the "Extended Bedroom").

9.      Following that meeting, Mr. McNulty drafted a plan dated September 11, 2018 (the "9/11/18 Plan").

10.      After reviewing the 9/11/18 Plan, Mr. Zamboni wrote to Mr. Fox and Mr. McNulty, noting that he did not see the fireplace on the floor plan and inquiring as to the expense of a masonry chimney because he was thinking about installing a wood stove in the basement at some future point.

11.      In or around May of 2019, Mr. Zamboni met with Mr. Fox to review the 9/11/18 Plan.

12.       Mr. Fox marked the 9/11/18 Plan in red ink to denote changes requested by Mr. Zamboni and both Mr. Fox and Mr. Zamboni signed the plan.

13.      At some point during that same meeting, Mr. Fox brought Mr. Zamboni to Bill Noone, then President of Chase, who noted additional changes on the 9/11/18 Plan in blue ink.[2]

14.      The changes identified in the Marked-Up 9/11/18 Plan included:

- the Extended Bedroom;
- a deck between the screened-in porch and the Extended Bedroom;
- handicap-accessible doors and bathroom fixtures;
- Trex decking;
- Certainteed vinyl shake siding;
- adjustments necessary to allow for the future installation of a wood stove in the basement;
- a whole-house generator system;
- cultured marble countertops in the bathrooms;
- granite countertops in the kitchen;
- a soaking tub without jets;
- black windows;
- a raised counter on the kitchen island;
- public water;
- side-by-side laundry;
- 30-year architectural shingles; and

---

[2] The Court refers to the 9/11/18 Plan bearing the handwritten notations of Mr. Fox and Mr. Noone as the "Marked-Up 9/11/18 Plan".

- a fireplace between the living room and the kitchen.[3]

15.    The Marked-Up 9/11/18 Plan is the only set of plans Mr. Zamboni ever signed.

16.    While discussing Mr. Zamboni's request for the double-sided fireplace shown in the Marked-Up 9/11/18 Plan, Mr. Noone told Mr. Zamboni about a free fireplace special that Chase was offering and that expired at the end of May 2019.

17.    Mr. Noone told Mr. Zamboni that he would be willing to extend the promotion if Mr. Zamboni executed a construction contract by the end of June 2019.

18.    At the time Mr. Zamboni engaged in preliminary discussions with Mr. Fox, he was living essentially rent-free in a multi-unit in Portland and he was in no particular rush to commence construction.  Zamboni PFF, ¶ 49.

19.    After Mr. Fox told Mr. Zamboni it would take approximately six months to complete construction, Mr. Zamboni began exploring options for selling his Portland residence.

*ii.  The Contract*

20.    On May 17, 2019, Mr. Zamboni received an e-mail from Mr. Fox quoting a contract price of $303,000.00.

21.    Five days later, on May 22, 2019, Mr. Fox e-mailed Mr. Zamboni again, stating that "there's going to be a page included" which would "have the itemized individual things so everybody's on the same page for example the sunroom the different specialty things we're doing I'm going to call out as included in the contract."

22.    In a June 14, 2019 e-mail, Mr. Fox informed Mr. Zamboni that his May 17, 2019 quote of $303,000 omitted the whole house generator so he would need to add $8,000 to the construction price.

---

[3] Mr. Zamboni asserts that the red markings on the September 11, 2018 plan also show that he did not want a door on the pantry.  While Mr. Zamboni testified at trial that he believed the plan markings reflected that request, the Court finds that the Marked-Up 9/11/18 Plan did not clearly denote that design change.

23.     That same day, Mr. Zamboni met with Mr. Fox at Chase's offices to review and sign

the contract, which was comprised of three documents drafted by Chase and entitled: (a)

Construction Contract; (b) Clarification Sheet; and (3) New Construction Specifications Modular.[4]

24.     Mr. Fox, as the only Chase employee present, signed the contract on behalf of Chase.

a.   The Construction Contract

25.     The Construction Contract stated a purchase price of $311,647 (the "Purchase Price")

for the construction of "a certain single-family home . . . shown on the plan entitled 'Zamboni' in

accordance with said plan and this contract and the specifications attached hereto."

26.     Chase determined the Purchase Price which came due at a closing to occur within ten

days after the Town issued a certificate of occupancy.

27.     In the meantime, Mr. Zamboni was to execute a promissory note for the outstanding

balance and give Chase a mortgage on the property.

28.     The Construction Contract provided that work was to begin "within a reasonable

time" and be completed "within a reasonable timeframe."

29.     It also stated that Chase would not be liable for "errors or omissions on the blueprints

provided by the designing contractor."

b.   The Clarification Sheet

30.     The Clarification Sheet listed ten items which had been identified on the Marked-Up

9/11/18 Plan:

- Screed [sic] in porch TREX DECKING
- Porch TREX DECKING
- Handicap doors and ADA compliance
- Gas stove
- Soaking tub no jets
- Granite kitchen and Island
- Full Generator Whole hose [sic] system

---

[4] The document entitled "New Construction Specification Modular" will be referred to herein as the "Specification Sheet".  The term "contract" as used in this memorandum of decision refers to all three documents, collectively.

- Bedroom 2 extended on plan
- Tile Bath and Kitchen
- Black Windows

31.     The list reflects some (but not all) of the changes shown on the Marked-Up 9/11/18

Plan.

### c.   The Specification Sheet

32.     Mr. Fox and Mr. Zamboni also executed the 19-page Specification Sheet on June 14,

2019.

33.     Except for the first and the last two pages of the document, Mr. Zamboni initialed the

bottom right corner of each page in a format that suggests they were applied electronically.

34.     Electronic initials or signatures also were affixed under the following sections:

Paving, Install Underground Service, and Important Notes & Disclosures.

35.     In addition to the electronic signatures, handwritten notes indicate changes to Mr.

Zamboni's e-mail address, floor sheathing materials, exterior siding materials, and pricing for

internal gas piping.

36.     Mr. Fox made the handwritten changes before Mr. Zamboni and Mr. Fox signed the

contract.  Zamboni PFF, ¶¶ 64-65.

37.     The final page stated the Purchase Price and included the same promissory note and

mortgage requirements as set forth in the Construction Contract.

38.     Mr. Zamboni and Mr. Fox signed the Specification Sheet with "wet signatures" and

dated their signatures, June 14, 2019.

39.     The Specification Sheet addressed various aspects of construction and contained both

requests for a buyer to make selections among various options for materials or services, and notices

regarding the scope of work.

40.     The Specification Sheet stated that paving would not be included in the base price.

7

41.     Nonetheless, Mr. Zamboni apparently requested that the driveway be paved because the Specification Sheet noted that a 1 ¼" "base/binder coat/course mix" would be applied after Chase and Mr. Zamboni determined the layout of the driveway.

42.     The Specification Sheet further provided that a septic system would be constructed in accordance with a plan obtained by Chase, but also indicated that the project required an "Elgin System".

43.     The Specification Sheet stated that Chase would use "Pressure Treated underpinning with STK cedar" in constructing the deck.

44.     According to the Specification Sheet, the standard siding for a Chase-built home was "double 4" Vinyl Siding (.042)."

45.     The word "wood" was stricken and immediately below that the words, "Vinyl Cedar Shakes in Gables: NO" appear, with "in Gables: NO" crossed out.

46.     The word "Throughout" was handwritten next to this.

47.     This change was not initialed in handwriting though the page did include the same electronic initials that appear on the other pages of the Specification Sheet.

48.     Under Electrical & Plumbing the Specification Sheet indicated that a full generator system would be installed at an additional cost of $8,000.

49.     The Specification Sheet identified a number of items to be determined at a pre-construction meeting but did not establish an allowance for any of them.

50.      Entries regarding a gas fireplace and a custom mantel and trim were stricken in their entirety.

iii.     *The 8/16/19 Plan*

51.     On or around August 13, 2019, Mr. Fox emailed Mr. McNulty asking him to provide final plans.

52.     Mr. McNulty asked Mr. Fox by email whether there were any changes to the 9/11/18 Plan.

53.     Mr. Fox responded to Mr. McNulty's email by copying Mr. Zamboni and asking, "Jeff the last set of prelim plans that we marked up were good correct."

54.     Mr. Zamboni replied that the plan was correct if it showed the Extended Bedroom, a deck between the Extended Bedroom and screened-in porch, a side-by-side washer and dryer, a masonry chimney, and a wall between the dining and living area to accommodate a dual-sided fireplace.

55.     On August 14, 2019, Mr. McNulty e-mailed Mr. Fox to say he had not started the final drawings but that he was not sure what size the double-sided fireplace would be and whether it was a gas or wood-burning stove.

56.     Two days later, on August 16, 2019, Mr. McNulty e-mailed Mr. Fox, John Chase, and cchase@cchfi.com an August 16, 2019 plan (the "8/16/19 Plan") and an invoice.

57.     Mr. McNulty did not copy Mr. Zamboni on the e-mail.

58.     The 8/16/29 Plan showed the side-by-side laundry, chimney, and fireplace but not the Extended Bedroom or the extended deck and handicap-sized doors Mr. Zamboni had requested.

*iv.     The Initial 10/29/19 Plan and the Final 10/23/19 Plan*

59.     In October 2019, Chase asked Mr. Zamboni to review the 8/16/19 Plan and the Marked-Up 9/11/18 Plan for accuracy.

60.     This was the first time Mr. Zamboni had seen the 8/16/19 Plan and he noted the omission of the extended deck.

61.     At 10:37 a.m. on October 23, 2019, Mr. McNulty produced a revised version of the plans, dated the same day (the "Initial 10/23/19 Plan").

62.     The Initial 10/23/19 Plan showed a deck that was not flush with the Extended Bedroom and the screened-in porch.

63.     Molly Shaw, a Marketing Director employed by Chase, forwarded the Initial 10/23/19 Plan to Mr. Zamboni at 11:44 a.m. of that day and asked him to conduct a final review.

64.     At 1:54 p.m. on October 23, 2019, Mr. McNulty e-mailed Mr. Zamboni stating, "This was the drawing I referenced with changes?  I can extend deck out to be flush with the end of bedroom/screen porch, if necessary?"

65.     Mr. Zamboni responded at 4:02 p.m., "Yes, that would be perfect, Thanks, Jeff."

66.     The next morning, Mr. McNulty e-mailed Mr. Fox, Ms. Shaw, and Mr. Noone, stating, "Revisions have been cleared by Jeff.  Please contact me with any other questions."

67.     The subject line on the October 24, 2019 e-mail read, "R090618-Zamboni Residence; REVISED and Final Drawings."

68.     The final version of the October 23, 2019 plan extended the deck so that it was even with the screened porch and the Extended Bedroom (the "Final 10/23/19 Plan").

69.     The Final 10/23/19 Plan reflected the design changes noted in handwriting on the Marked-Up 9/11/18 Plan.

70.     The Final 10/23/19 Plan also, however, showed doors on the pantry.

B.   Construction

71.     Without Mr. Zamboni's knowledge or consent, Chase obtained a new septic design instead of using the Frick Septic Design.

72.     In addition to siting the house closer to the road than shown in the Frick Septic Plan, the new septic plan did not include an Eljen system, was not designed to accommodate a one-bedroom accessory dwelling, and did not have as much capacity as the Frick Septic Design.

73.     The foundation that Chase poured included the Extended Bedroom.

C.   The Contract Dispute

74.     In April of 2020, Mr. Zamboni reached out to Chase to express his concerns about the delays and lack of progress.

75.    He met a Chase employee named Nick Moulton at the house to discuss several issues, including Chase's slow progress.

76.    Mr. Zamboni followed up on his concerns with Mr. Fox but was offered no resolution.

77.    In early May of 2020, Mr. Zamboni received from Chase, and executed, a promissory note (the "Promissory Note") in the amount of the Purchase Price and a mortgage securing that note (the "Mortgage").

78.    Soon thereafter, Chase sent a change order charging an additional $37,500.00 beyond the Purchase Price for the work and materials associated with the Extended Bedroom, which, at that point, had already been framed and roofed (the "Change Order").

79.    Mr. Zamboni refused to pay the Change Order and told Chase that the Purchase Price included the cost of the Extended Bedroom.

80.    Mr. Zamboni met with Mr. Fox and Mr. Noone on May 28, 2020 to discuss the Change Order and other project-related issues.

81.    During that meeting, Mr. Zamboni showed Mr. Fox and Mr. Noone references to the Extended Bedroom in the contract.

82.    The following day, Mr. Noone e-mailed Mr. Zamboni and told him that Chase would not perform any further work until Mr. Zamboni and John Chase were "back on the same page."

83.    Mr. Zamboni met with Mr. Chase and Mr. Noone on June 16, 2020 to discuss the Change Order and other issues.

84.    Chase terminated Mr. Fox's employment later that same day.

85.    At that point, the house was approximately 70% complete.

D.  Continued Construction

86.    After Chase left the job, Mr. Zamboni had a difficult time finding a contractor to complete a partially constructed house subject to an ongoing contract dispute.

87.     The first contractor Mr. Zamboni never started because his son had a heart attack and the second contractor completed only a small amount of work before he, too, had a heart attack.

88.     Some of the work completed by the second contractor was defective but Mr. Zamboni's claim for damages does not include costs associated with fixing that contractor's work.

89.     Mr. Zamboni eventually hired Lee Squibb in April 2021 on a time and materials basis.

90.     Mr. Zamboni purchased his own materials to avoid a contractor markup.

91.     The COVID-19 pandemic caused an increase in the cost of construction, including both the cost of goods (especially lumber) and the cost of labor.

92.     Mr. Squibb and various contractors completed most of the outstanding items, including: siding, wall paint, decking, rails and stairs for decks and porches, soffits, baseboards and trim, flooring (tile in the bathrooms and entry, hardwood elsewhere), rough-in plumbing and heating, finish plumbing and heating, finish electrical, basement ceiling and wall fiberglass insulation, basement sill spray insulation, a door to the basement bulkhead, dryer and stove vent, bathroom fixtures, cabinets, sinks, mirrors, porch ceilings, fireplace, chimney, gravel in the driveway, some sheathing, two half walls with columns, handrails in garage and basement, countertops, tile showers, window flashing, and smoke alarms.

93.     Mr. Squibb hired a carpenter named Andrew Collins to do most of the carpentry work.

94.     Three or four carpentry helpers assisted Mr. Collins from time to time.

95.     Mr. Squibb billed Mr. Zamboni $55/hour for Mr. Collins' time and $45/hour for carpentry helpers.

96.     Mr. Squibb paid Mr. Collins $35/hour and the carpentry helpers $25/hour.

97.     The carpentry work included rebuilding walls that were out of square, installing the butler's pantry cabinetry, removing the butler's pantry doors, rebuilding the laundry area, rehanging

12

porch joists, replacing a mismatched kitchen cabinet, reflashing the back deck framing, rebuilding

the front deck framing to account for a footing that had been poured in the wrong location, repairing

trim, rehanging the back deck ledger, fixing leaks and replacing materials that had developed mildew,

rehanging and reflashing all of the exterior doors, and rebuilding the framework of the screen porch.

Zamboni PFF, ¶ 144.

E.   <u>Damages</u>

98.    As of the trial, Mr. Zamboni had spent $320,316.80 completing the house after Chase

walked off the job.

99.     Mr. Zamboni concedes that $25,104.92 of this amount is outside the scope of the

contract.

100.    Mr. Zamboni intends to install a full-house generator at a cost of $10,590.22.

101.    He also estimates that he will spend either $5,000 to expand the existing septic

system or $30,000 to replace the septic system with the original design.

102.    Mr. Zamboni estimates it will cost him an additional $9,000 to level, loam, and plant

grass and a further $7,000 to complete screen in-fills on the screened-in porch.

### III.    Discussion of Liability

A.   <u>Agency</u>

Before turning to a discussion of the merits of Mr. Zamboni's claims and Chase's

counterclaims, the Court first addresses a foundational issue that impacts both the evidence and the

contractual claims of this case: the authority of Mr. Fox as an agent of Chase.  "Agency is the

fiduciary relationship 'which results from the manifestation of consent by one person to another that

the other shall act on his behalf and subject to his control, and consent by the other so to act.'"  <u>Libby</u>

<u>v. Concord Gen. Mut. Ins. Co.</u>, 452 A.2d 979, 981 (Me. 1982) (quoting <u>Defosses v. Notis</u>, 333 A.2d

83, 86 (Me. 1975)).  Maine courts recognize both actual and apparent agency.  <u>Libby</u>, 452 A.2d at

981 (citing <u>Stevens v. Frost</u>, 32 A.2d 164, 167 (Me. 1943).

Actual agency can be either express or implied.  Libby, 452 A.2d at 981 (citing Stevens, 32 A.2d at 168).  "Express authority is that authority which is directly granted to or conferred upon the agent or employee in express terms by the principal, and it extends only to such powers as the principal gives the agent in direct terms; and the express provisions are controlling where the agency is expressly conferred."  Stevens, 32 A.2d at 168.  "Implied authority is actual authority circumstantially proven from the facts and circumstances attending the transaction in question and includes such incidental authority as is necessary, usual and proper as a means of effectuating the purpose of the employment, and this is so whether an agency is general or special."  Stevens, 32 A.2d at 168-69.

The evidence adduced at trial does not support Chase's contention that Mr. Fox exceeded the scope of his agency as it related to the Zamboni project.  As detailed in the Court's factual findings, Mr. Fox was a Chase employee whose responsibilities included meeting with clients and developing construction plans.  Chase presented testimony of Mr. Noone, who was the President of Chase at the time in question, indicating that Mr. Fox generally needed to obtain Mr. Chase's approval of a contract and its terms before presenting that contract to clients and executing the same.  Mr. Noone further asserted Mr. Chase never approved the contract with Mr. Zamboni and, therefore, Mr. Fox could not bind Chase to its terms.

In the absence of testimony by Mr. Chase and Mr. Fox, Mr. Noone's testimony at best raises doubt regarding Mr. Fox's express or implied authority.  Even crediting Mr. Noone's testimony on this authority issue, however, the preponderance of the evidence establishes that Mr. Fox had apparent authority.  "Apparent authority is authority 'which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing.'" Steelstone Indus., Inc. v. North Ridge Ltd. P'ship, 735 A.2d 980, 983 (Me. 1999) (quoting Williams v. Inverness Corp., 664 A.2d 1244, 1246 (Me. 1995).  "A claim of apparent agency is proved by the following elements: (1) the defendant either intentionally or negligently held a person out as [its]

agent for services, (2) the plaintiff did in fact believe the person to be an agent of the defendant, (3)

the plaintiff relied on the defendant's manifestation of agency, and (4) the plaintiff's reliance was

justifiable." Remmes v. Mark Travel Corp., 116 A.3d 466 (Me. 2015) (internal quotations omitted)

(citing first Levesque v. Cent. Maine Med. Ctr., 52 A.3d 933, 936-37, n. 7 (2012); and then citing

Williams, 664 A.2d at 1246-47).

Chase designated Mr. Fox as Mr. Zamboni's primary contact leading up to execution of the

contract. Their meetings, including the contract signing meeting on June 14, 2019, occurred at

Chase's offices. Mr. Noone, himself, testified that Mr. Fox acted in the scope of his employment by

preparing the contract documents and then executing them on behalf of Chase. Nothing in the

documents or testimony provided to the Court suggested that Mr. Zamboni was ever told: (1) that the

validity of the contract was conditioned upon Mr. Chase's prior approval of its terms and conditions;

or (2) that Mr. Fox had not, in fact, obtained such approval. Mr. Zamboni justifiably relied on Mr.

Fox's apparent authority to finalize the terms of the contract.

Instead of calling Mr. Fox as a witness, Mr. Zamboni testified as to statements made by Mr.

Fox and offered into evidence e-mail correspondence between Mr. Fox and others. During trial, the

Court allowed the statements into evidence subject to a later determination as to whether the

statements attributed to Mr. Fox were made within the scope of his employment or agency. 4/30/24

Tr. at 38:4-9. The Court hereby concludes the statements are admissible under Federal Rule of

Evidence 801(d)(2)(D).[5]

---

[5] While the Court finds that the proffered statements by Mr. Fox are not hearsay, the Court has nonetheless weighed
the reliability of these statements in light of all of the evidence submitted. Some of Mr. Fox's statements are
supported by contemporaneous e-mails and other documents. The Court has assigned less weight to verbal
statements of Mr. Fox presented solely through testimony by Mr. Zamboni. While Mr. Zamboni generally presented
as a credible witness, the conversations he related occurred between four and six years ago. Also, the Court notes
that Mr. Zamboni offered no explanation for not calling Mr. Fox as a witness.

Also stemming from the finding of apparent agency is the Court's conclusion that Chase was obligated to perform in accordance with the terms and conditions of the contract.  Having found that both parties were bound by the terms of the contract, the Court turns to the issue of breach.

B.  Breach of Contract

"A material breach of contract is a nonperformance of a contractual obligation that excuses the injured party from further performance and justifies the injured party in regarding the whole transaction as at an end."  H & B Realty, LLC v. JJ Cars, LLC, 246 A.3d 1176, 1184 (Me. 2021) (citing Cellar Dwellers, Inc. v. D'Alessio, 993 A.2d 1, 5 (Me. 2010).  See also, Down East Energy Corp. v. RMR, Inc., 697 A.2d 417, 421 (Me. 1997) (quoting Arthur Linton Corbin, 4 CORBIN ON CONTRACTS § 946 at 809-10 (1951)) ("A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end . . .").

Mr. Zamboni argues Chase materially breached the contract by conditioning future performance of its obligations under the contract upon Mr. Zamboni's payment of the Change Order, which effectively double-charged Mr. Zamboni for the Extended Bedroom.  Chase, on the other hand, argues that Mr. Zamboni breached the contract by refusing to pay both the Change Order and the Purchase Price notwithstanding the fact that the Town issued the certificate of occupancy.  Under either theory, the Change Order clearly led to a total breach. [6]

The contents of the contract documents determine the rights and obligations of the parties. The language of the contract controls when it is clear and unambiguous.  Portland Valve, Inc. v. Rockwood Sys. Corp., 460 A.2d 1383, 1387 (Me. 1983) ("The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of

---

[6] Mr. Zamboni also argued Chase breached the contract by: (1) failing to complete the house within the time Mr. Fox said the project would be completed; (2) building the house in the wrong location on the lot; (3) installing the incorrect septic system; and (4) and failing to build a masonry chimney.  Although these breaches factor by varying degrees into the discussion of damages below, they are not what brought the transaction to an end.

the instrument without resort to extrinsic evidence.") (first citing <u>City of August v. Quirion</u>, 436 A.2d 388, 392 (Me. 1981); and then citing <u>T-M Oil Co., Inc. v Pasquale</u>, 388 A.2d 82, 85 (Me. 1978)).

Although Mr. Zamboni and Mr. Fox executed the Construction Contact, the Specification Sheet, and the Clarification Sheet at the same time, it is impossible for the Court to determine the relationship between these three documents simply by referring to the language contained therein. The Construction Contract and the Specification Sheet state the same Purchase Price but neither of those documents, nor the Clarification Sheet, contain any specific references to the other documents. None of the documents contain an integration clause.  See <u>Handy Boat Serv., Inc. v. Pro. Serv., Inc.</u>, 711 A.2d 1306, 1308-09 (Me. 1998).

The Construction Contract is a largely boilerplate document and does not list any details particular to the project.  The Specification Sheet identifies many design choices specific to Mr. Zamboni's build but it also indicates that some design choices will be made at a later date.  The Specification Sheet reflects some, but not all, of the changes indicated on the Marked-Up 9/11/18 Plan and listed on the Clarification Sheet.  Of the ten items listed on the Clarification Sheet, at least one of them—the whole house generator—appears to line up with selections made on the Specification Sheet.  Other items, however, are inconsistent with the Specification Sheet.  Where the Clarification Sheet lists a "Gas stove", for instance, the parties struck the Gas Fireplace provision from the Specification Sheet.  Other items identified on the Clarification Sheet, such as the "Soaking tub no jets" and "Handicap doors and ADA compliance" do not appear in the Specification Sheet even though that document references selections as to interior doors and plumbing fixtures.

The Court therefore finds the three documents to be ambiguous in the sense that it cannot be readily determined which documents comprise the agreement between the parties or what language within the documents control the agreement's terms.  <u>Reliance Nat'l Indem. v. Knowledge Indus. Services, Corp.</u>, 868 A.2d 220, 228 (Me. 2005) (quoting <u>Villas by the Sea Owners Ass'n v. Garrity</u>,

748 A.2d 457, 461 (Me. 2000)) ("A contractual provision is ambiguous 'if it is reasonably possible to give that provision at least two different meanings.'").

"Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties." Portland Valve, 460 A.2d at 1387.    Consistent with well-established principles of contract construction, Maine courts construe ambiguities in a document against its drafter.    Barrett v. McDonald Invs., Inc., 870 A.2d 146, 150 (Me. 2005) (quoting 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 32:12 at 471–72 (4th ed. 1999)) ("Since the language is presumptively within the control of the party drafting the agreement, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter."). See also, Monk v. Morton, 30 A.2d 17, 19 (Me. 1943) ("The rule that an ambiguous contract will be construed more strongly against him who uses the words concerning which doubt arises is more than an arbitrary rule. Its purpose is to give effect to the intention of the parties.").    Accordingly, the Court construes any ambiguity in the contract at issue against Chase, as the drafter.

As noted earlier, Mr. Fox, who drafted the contract on behalf of Chase, did not testify at trial. Mr. Zamboni, however, testified that he believed that the contact is comprised of the Construction Contract, the Specification Sheet, and the Clarification Sheet, and that the Purchase Price set forth in both the Construction Contract and the Specification Sheet included the changes listed on the Clarification Sheet.

Mr. Zamboni explained that the following facts formed the basis for that belief: (1) Mr. Zamboni, Mr. Noone, and Mr. Fox made the changes reflected in the Marked-Up 9/11/18 Plan the month before Mr. Zamboni and Mr. Fox signed the contract documents; (2) the Marked-Up 9/11/18 Plan is the only plan Mr. Zamboni ever signed; (3) Mr. Fox told Mr. Zamboni in his May 22, 2019 e-mail that there would be "a page included" which would identify the changes they had discussed; (4) the Clarification Sheet reflects the changes in the Marked-Up 9/11/18 Plan; (5) the Clarification

18

Sheet appears to be the "page" to which Mr. Fox referred in his May 22, 2019 e-mail; (6) the

Specification Sheet included the whole house generator listed in the Clarification Sheet; (7) Mr. Fox

increased the Purchase Price from $303,000 to $311,647 after stating that the generator, which

appears on the Clarification Sheet and in the Specification Sheet, would cost an additional $8,000;

(8) although Chase constructed the home in accordance with the requests on the Clarification Sheet,

the only item on the Clarification Sheet for which Chase sought a change order was the Extended

Bedroom; and (9) Chase issued the Change Order for the Extended Bedroom *after* the foundation had

been poured and the room had already been framed and drywalled in accordance with the Marked-Up

9/11/18 Plan.  The Court finds that the chronology of these events evidences Mr. Zamboni's and Mr.

Fox's mutual understanding and intent that the Purchase Price included the cost of the Extended

Bedroom.

Mr. Noone, who was not present when Mr. Zamboni and Mr. Fox signed the contract,

testified that the Clarification Sheet listed items to be priced and that none of the changes reflected in

that document were included in the Purchase Price.  He further testified that he told Mr. Zamboni that

a new plan would need to be drawn before Chase could provide a price for the Extended Bedroom.

Mr. Zamboni has no recollection of that conversation and, even if he did, that conversation took place

*before* Mr. Zamboni signed the contract.  As Mr. Noone acknowledges, Mr. Zamboni primarily

worked with Mr. Fox, and it was Mr. Fox who drafted the documents, which referenced the Extended

Bedroom.  Given the circumstances listed above, Mr. Zamboni was justified in believing that Chase

had priced the Extended Bedroom into the Purchase Price.  In fact, it would be unreasonable for Mr.

Fox to expect Mr. Zamboni to commit to the construction of the Extended Bedroom before knowing

the price of such a significant addition; just as it would be unreasonable for Chase to move forward

with the construction of the Extended Bedroom without first obtaining Mr. Zamboni's commitment

to pay the additional cost.

It may be true that Mr. Chase and Mr. Noone believed that the Purchase Price was insufficient to cover the cost of the labor and materials for the Extended Bedroom and it may also be true that they were justified in that belief.  It is also likely Mr. Chase and Mr. Noone did not discover Mr. Fox's error until sometime shortly before the Change Order was issued.  These facts, however, are irrelevant to the question of whether Mr. Zamboni, as purchaser, and Mr. Fox, as agent for Chase, understood that the Purchase Price included the cost of the Extended Bedroom. A Chase employee drafted the contract and the Court finds that Mr. Zamboni reasonably believed that the Purchase Price set forth in that ambiguous document included the changes itemized in the Clarification Sheet.

 Construing the contract in Mr. Zamboni's favor, the Court concludes that his refusal to pay the Change Order was justified.  The Court therefore finds that Chase materially breached the contract, and, therefore, that the entire transaction was at an end.  At that point, Mr. Zamboni was relieved of his obligations to perform under the contract and, in turn, the Promissory Note.  As such, Mr. Zamboni is entitled to damages and a discharge of Chase's lien on the property.

C.  Mr. Zamboni's Claim Under the HCCA and UPTA

Mr. Zamboni further alleges that Chase violated the HCCA and the UTPA by: (1) failing to complete construction within the time estimated by Mr. Fox; and (2) refusing to finish constructing the home until Mr. Zamboni paid the Change Order.

With respect to the lack of a completion date, the HCCA requires that any contract for construction of a home exceeding $3,000 in material and labor be in writing.  10 M.R.S. § 1487. That writing must set forth "[b]oth the estimated date of commencement of work and the estimated date when the work will be substantially completed."  10 M.R.S. § 1487(3).  The contract at issue in this case contains neither an estimated date on which work would commence, nor an estimated date of completion and, therefore, the contract violates the HCCA.  In the absence of a firm timeline, Mr. Zamboni prematurely sold his residence in Portland resulting in rental and storage costs that could otherwise have been avoided.  The HCCA is designed to protect homeowners from exactly this type

of financial harm.  Therefore, it is not surprising that a violation of the HCCA constitutes a prima

facie violation of the UTPA, which is designed to  safeguard consumers from "unfair or deceptive

acts or practices in the conduct of any trade or commerce."  5 M.R.S. § 207.  Chase is therefore liable

under both the HCCA and the UTPA.

The Court concludes, however, that Chase's conduct surrounding the Change Order did not

violate the UTPA.  "Whether an act or practice is unfair or deceptive for purposes of section 207 of

the UTPA cannot be defined precisely and must be determined by the factfinder on a case by case

basis." Binette v. Dyer Libr. Ass'n, 688 A.2d 898, 906 (Me. 1996) (citing Guiggey v. Bombardier,

615 A.2d 1169, 1172 (Me. 1992)).  Factors courts consider in determining whether an act or conduct

violates the UTPA include whether: (1) it is likely to mislead reasonable consumers; (2) it contains a

level of "rascality" that exceeds the normal "rough and tumble" of the commercial world; and (3) it

results in an injury the consumer could not have reasonably avoided.  See Sumsinski v. Maine

Appliance Warehouse, Inc., 602 A.2d 1173, 1174 n.1 (Me. 1992); State v. Weinschenk, 868 A.2d 200,

206 (Me. 2005); Masure v. Donnelly, 962 F.2d 128, 134 (1st Cir. 1992).

On the record presented, the Court cannot find that the issuance of the Change Order, and/or

Chase's refusal to perform further work amounts to a brazen effort to strong-arm an unwitting Mr.

Zamboni into paying twice for the Extended Bedroom.  The evidence establishes that the contract at

issue was carelessly drafted by Chase but it also suggests that Mr. Zamboni could reasonably have

avoided some of his home construction issues by being more diligent in reviewing the draft plans and

the contract terms.  There is no evidence in the record to suggest that the breach of contract reaches a

level of "rascality," such that it also amounts to a violation of the UTPA.

C.  Chase's Claim Under the PPA

In Count I of its Complaint, Chase contends that Mr. Zamboni violated the PPA by refusing

to pay Chase even after the Town issued a certificate of occupancy.  Under the PPA, a homeowner is

required to pay the contractor strictly in accordance with the terms of the construction contract.  10

M.R.S. § 1113(1).  Chase's claim fails because it breached the contract prior to the issuance of the

certificate of occupancy.  As the Court found in resolving the breach of contract claims, this breach

by Chase meant Mr. Zamboni was reasonably justified in treating the transaction as terminated.

Accordingly, Chase is not entitled to recover attorney fees, costs, or interest under the PPA.

     D.  Chase's Unjust Enrichment and Quantum Meruit Claims

Chase seeks recovery under theories of unjust enrichment and quantum meruit for the work it

performed prior to quitting the project.  A party successfully establishes a claim of unjust enrichment

by showing that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had

knowledge of the benefit; and (3) the defendant retained the benefit without paying the plaintiff for

its value.  A.F.A.B., Inc. v. Town of Old Orchard Beach, 610 A.2d 747, 749 (Me. 1992) (quoting

Estate of White, 521 A.2d 1180, 1183 (Me. 1987)).  "A valid claim in quantum meruit requires: 'that

(1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of

the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect

payment."  Paffhausen v. Balano, 708 A.2d 269, 272 (Me. 1998) (quoting Bowden v. Grindle, 651

A.2d 347, 351 (Me. 1994)).  "Although the terms are often mistakenly used interchangeably, unjust

enrichment differs from quantum meruit in that the latter refers to the compensation that is due a

plaintiff under a theory of implied contract, whereas the former assumes that there was no contractual

relationship between the parties."  Larson v. Johnson, 184 F. Supp. 2d 26, 34 (D. Me. 2002) (citing

Aladdin Elec. Assocs. v. Town of Old Orchard Beach), 645 A.2d 1142, 1144 (Me. 1994)).

There is no question in this case that Chase rendered services to Mr. Zamboni and that Mr.

Zamboni had knowledge of those services.  The parties agree that the house was 70% complete when

Chase walked off the job and that Mr. Zamboni has not paid Chase for any of that work.  The

question is whether the existence of an express contract precludes Chase from collecting under

implied and constructive contract theories.

The answer is affirmative with respect to Chase's claim for unjust enrichment.  Richard A. Mathurin and Assoc., LLC v. Crowe, 338 F.Supp.2d 157, 161 (D. Me. 2004) (citing, Nadeau v. Pitman, 731 A.2d 863, 867 (Me. 1999)).  A quantum meruit claim, however, can co-exist with an express contract under Maine law.  Combustion Eng'g, Inc. v. Miller Hydro Grp., 812 F.Supp. 260, 262-63 (D. Me. 1992) (a party acting in good faith to fulfill its services under a contract may recover the value of its services less any damage caused by the party's failure to ultimately fulfill the contract) (first citing Gosselin v. Better Homes, Inc., 256 A.2d 629 (Me. 1969) and then citing Veazie v. City of Bangor, 1863 WL 1320 at *1 (Me. 1863)).  See also Abington Constructors, Inc. v. Madison Paper Indus., 2000 WL 620203 at *7 (1st Cir. March 21, 2000).  Therefore, the Court finds that Chase has established a claim for quantum meruit and is entitled to damages on that basis.

### IV.      Discussion of Damages

Having found for Mr. Zamboni on his claims for breach of contract and violation of the HCCA and UTPA, and for Chase on its quantum meruit claim, the Court turns to the assessment of damages.

A.      Damages Awarded to Mr. Zamboni on Count I (Breach of Contract)

"As a general rule, damages for defective performance under a construction contract may be measured either by the reasonable costs of reconstruction and completion in accordance with the contract, or by the diminished value to the owner of the building by reason of the defects." Marchesseault v. Jackson, 611 A.2d 95, 98 (Me. 1992) (citing first Parsons v. Beaulieu, 429 A.2d 214, 217 (Me. 1981); and then citing 5 A.Corbin, CONTRACTS § 1089 (1964)).  Specifically, with respect to the cost of reconstruction and/or completion, damages are often measured by the difference between the contract price and actual total cost to the homeowner to complete the house.  See Treadwell v. J.D. Constr. Co., 938 A.2d 794, 800 (Me. 2007); Brace v. Titcomb, 2002 WL 1335871 at *2 (Me. Super. May 17, 2002).  The purpose of an award for damages is to put the plaintiff in the same position in which he, she or they would have been the contract been completed.  Brown v.

23

Compass Harbor Vill. Condo. Ass'n, 229 A.3d 158, 164 (Me. 2020). "An injured party is entitled to recover for all losses actually suffered as a result of the breach." Id. (quoting Lee v. Scotia Prince Cruises Ltd., 828 A.2d 210, 216 (Me. 2003)).

The actual total cost includes overhead and profit by a contractor or subcontractor hired by the homeowner to complete or reconstruct the home. Anuszewski v. Jurevic, 566 A.2d 742, 744 (Me. 1989) ("We see no reason to exclude reasonable and customary profit and overhead of a contractor from the cost of repairs to remedy defects in a breach of contract case."). While a plaintiff has a "duty" to mitigate his or her damages through reasonable efforts, mitigation is an affirmative defense, and it is the defendant's burden to establish that a plaintiff failed to take reasonable steps to minimize the damage. Marchesseault, 611 A.2d at 99 (citing Lindsey v. Mitchell, 544 A.2d 1298, 1301 (Me. 1988)).

   i. *Costs Incurred by Mr. Zamboni in Completing the Home*

Chase departed the job in June of 2020; in the early days of a pandemic that disrupted supply chains and created massive labor shortages. Mr. Zamboni credibly testified that he had trouble finding a contractor to complete the project. In fact, Mr. Squibb was the third contractor Mr. Zamboni hired following Chase's breach. Mr. Zamboni further testified that, where possible, he purchased the same materials in finishing the home as he had selected in pre-construction meetings with Chase. If supply chain issues rendered the same materials unavailable, he purchased the next closest style and make.[7] He purchased materials from Chase's preferred vendor, where possible, and endured the hassle of purchasing them himself to avoid any markup Mr. Squibb would have applied.[8]

---

[7] For instance, Mr. Zamboni attempted to purchase the same flooring Chase offered as its standard option through Classic Flooring. When Mr. Zamboni attempted to purchase the same product, however, it was unavailable, so he purchased the next most comparable product. Chase offered no evidence establishing either: (1) that the standard flooring selection was, in fact, available; or (2) that the replacement Mr. Zamboni chose was vastly superior in quality.

[8] Chase's expert, Phil LaClaire, testified that Mr. Zamboni paid too much for labor and materials. In calculating lower costs, Mr. LaClaire referred to a national database called RSMeans, Home Depot prices, and personal experience. Mr. Zamboni's expert, Carl Chretien, contends that, his experience, the labor estimates listed in RSMeans are too high. The Court need not weigh in on this battle. As noted above, Mr. Zamboni is entitled to

As of the date of the trial, Mr. Zamboni had spent $320,316.80 to bring the house near completion.  Of that amount, $25,104.92 in labor and materials relate to work that Mr. Zamboni concedes was outside the scope of the contract and, therefore, is nonrecoverable.  He estimates he will need to spend another $56,590.22 to purchase and install a generator ($10,590.22), install the correct septic system ($30,000), level, loam and seed the property ($9,000), and complete the screened-in porch ($7,000).  According to Mr. Zamboni, then, he is entitled to actual damages in the amount of $351,802.10.  Chase argues that some of the line items comprising this figure are nonrecoverable.

First, Chase correctly argues that the contract did not include the cost of paving the driveway. The Specification Sheet is the only one of the three contract documents which references paving. Although that document states that the driveway will be paved to certain specifications, it also clearly states that the cost of the paving is not included in the base price.  The Court construes the plain language of this document to mean that Chase intended to bill the cost associated with the paving through a subsequent change order.  The only extrinsic evidence offered to challenge this conclusion was Mr. Zamboni's testimony that Mr. Fox told him that the cost of the paving was included in the Purchase Price.  Given that Mr. Zamboni bears the burden of establishing the extent of his damages and did not call Mr. Fox to testify, the Court declines to accept Mr. Zamboni's recollection of statements contradicting the plain language of the contract.  Mr. Zamboni's claim will be reduced by $9,600.

Mr. Zamboni's request for damages includes costs associated with modifying a laundry closet and pantry Chase built in accordance with the Final 10/23/19 Plan.  Mr. Zamboni and Mr.

---

recover what he *actually* spent in completing work within the scope of the contract's terms, including the cost of overhead.  Brown, 229 A.3d at 164.  Absent evidence that Mr. Zamboni eschewed a specific vendor offering a significantly more favorable price, purchased an excessive amount of material, or chose more expensive finishes than those contemplated by the contract, the prices shown in a national database during an especially volatile period in the market are not particularly persuasive.  Marchesseault, 611 A.2d at 99.

Collins testified that Chase built the laundry closet too shallow to receive the washer and dryer Mr.

Zamboni purchased.  Mr. Zamboni also testified that, notwithstanding the pantry doors shown in the

Final 10/23/19 Plan, he specifically requested that the pantry be constructed without doors.  As noted

above, the Construction Contract explicitly states, "Builder is not responsible for errors or omissions

on the blueprints provided by the designing contractor hired by either the Buyer or Builder."  Pl. Exh.

6, ¶ 14.  Mr. Zamboni did not identify either the pantry doors or the depth of the laundry closet as an

issue when he reviewed the final plans with Mr. McNulty.  Chase then built the pantry and laundry

closet in accordance with those plans.    Accordingly, Mr. Zamboni is not entitled to recover the

$3,450 in labor and materials associated with modifications to those areas.

Mr. Zamboni also argues he is entitled to recover either: (1) $5,000 to expand the existing

septic system; or (2) $30,000 to replace the entire septic system with the original design.  The

Specification Sheet clearly states that an Eljen system was required.  Mr. Zamboni testified that he

wanted the Eljen system because he needed sufficient septic capacity to use the Extended Bedroom

as an in-law apartment.  He did not provide any evidence that the existing septic system is unreliable

beyond his own testimony that it is insufficient to support the Extended Bedroom.  The Court will

award Mr. Zamboni $5,000 to cover the cost of expanding the existing system but finds that Mr.

Zamboni did not sufficiently establish that the system Chase installed is inferior in any other way to

an Eljen system.  Therefore, Mr. Zamboni's request for damages will be reduced by $25,000.00.

Chase further contends that Mr. Zamboni should not be permitted to recover the costs

associated with the installation of a stone surround and mantel relative to the gas fireplace.[9]  Although

the Clarification Sheet references a "Gas stove", that document makes no reference to a mantel and

---

[9] In support, Chase points to a flyer offering a free gas fireplace for any new home to go under contract by March
31, 2019.  Def. Exh. 30.  That flyer states, "Mantel and stone surround not included, but can be added as upgrades."
Id.  Chase argues that this was the promotion offered to Mr. Zamboni, although the expiration term was extended to
the end of June 2019.  Mr. Zamboni testified that he never saw the flyer and Chase could not credibly establish
otherwise. On this record, the Court does not assign any evidentiary value to the document.

surround.  Meanwhile, the Specification Sheet strikes any reference at all to a gas fireplace, including any reference to a standard paint grade mantel and a tile surround which would have come out of the flooring allowance.  Mr. Zamboni relies on statements made to him by Mr. Fox to support his understanding that the contract price included the mantel and stone surround.  Once again, however, the Court is reluctant to accept at face value Mr. Zamboni's recollection of statements allegedly made by Mr. Fox where those statements contradict the terms of the contract.  Accordingly, the Court will deduct $8,280 from Mr. Zamboni's request for damages.

Mr. Zamboni also claims $11,200 for the purchase and installation of granite steps.  None of the three documents comprising the contract provide for granite steps.  Mr. Zamboni testified that Mr. Fox told him that granite steps are standard on Chase homes.  Again, absent clear language in the contract to support Mr. Zamboni's recollection, the Court finds that he did not carry his burden in establishing that the Purchase Price included the cost of granite steps or the cost of installing railings on those steps.  The Court will, therefore, deduct $11,200 from Mr. Zamboni's request for damages.

Chase would also have the Court deduct the difference in cost between the standard vinyl siding offered by Chase and the vinyl cedar shakes Mr. Zamboni actually installed.  Mr. Zamboni contends the vinyl cedar shakes are within the scope of the contract.  The boilerplate language in the contract describes the standard siding as ""double 4" Vinyl Siding (.042) with stock colors to be selected in builder's showroom" but a series of handwritten and typewritten changes to this section render the entire provision ambiguous.  Mr. Zamboni credibly testified that Mr. Fox made the changes at the time he signed the contract and that they reflect his desire to clad the entire house in vinyl cedar shakes.[10]  Construing the ambiguity against the drafter, the Court concludes that Mr.

---

[10] Chase argues that since the handwritten changes were not initialed, they could have been made at any time.  The mere fact this change is not specifically initialed does not lend credence to Chase's speculation that the change was added later in the face of Mr. Zamboni's uncontroverted testimony otherwise.  Even the specifically initialed provisions in the Specification Sheet could have been added by Mr. Zamboni post-execution since none of the handwritten changes are countersigned or initialed by Mr. Fox or any other Chase representative.

Zamboni reasonably believed the contract price included vinyl cedar shakes over the entirety of the house.[11]

The Court likewise rejects Chase's contention that several of the materials purchased by Mr. Zamboni exceeded contract allowances. The Specification Sheet is not clear on allowances. In places, certain upgrades are explicitly priced but in others. In other places, the Specification Sheet directs the homeowner to select certain finishes and materials and indicates that certain upgrades are available at an additional cost but does not state the price of the upgrade. In still other places, the Specification Sheet states that design selections will be made at a pre-construction meeting but does not reference allowances. Mr. Zamboni testified that he knew that he would be responsible for excess cost associated with upgrades, but he does not recall ever being given a list of applicable allowances. The Court will not permit Chase to retroactively impose allowances on materials without evidence that they were part of the original contract terms.

After deducting the items identified above from Mr. Zamboni's $351,802.10 claim, the Court hereby finds that the actual cost to Mr. Zamboni of completing the house in accordance with the terms of the contract is $294,272.10.[12]

   ii.   _Calculation of Damages Under Maine Law_

Having determined the amount Mr. Zamboni will ultimately spend to complete the home in accordance with the terms of the contract, the Court turns to the amount of damages to be awarded to

---

[11] Chase also contends, through testimony offered by Mr. LaClaire, that Mr. Zamboni purchased too much siding. The Court finds Mr. LaClaire's calculations unpersuasive considering Mr. Zamboni's own testimony that Hancock Lumber estimated the number of squares Mr. Zamboni needed to purchase and that, following installation, just one extra square remained. The Court finds no reasonable motive for Mr. Zamboni to misrepresent the accuracy of Hancock Lumber's siding calculations and there is no evidence that Mr. Zamboni is holding an excessive amount of unused siding.

[12] Mr. Zamboni also seeks recovery of compensatory damages in the amount of $31,125 comprised of: (1) rent incurred by Mr. Zamboni while he waited for the house to be completed; and (2) costs associated with storing a piano during that time. Mr. Zamboni argues he is entitled to collect these damages because he sold his apartment in reliance upon Mr. Fox's assurances that the house would be completed by December of 2019. Mr. Zamboni's testimony regarding his recollection of these statements is unsupported by any other evidence. In fact, the contract provides only that work be completed within a reasonable time. The Court therefore finds that these costs do not arise out of any breach by Chase and are not recoverable under Count I

Mr. Zamboni on his breach of contract claim.  Mr. Zamboni asks the Court to award him the total

cost of completing the project.  Such an award, however, would be inconsistent with both the law of

recovery in Maine and the facts of this case.

As noted above, the general rule in Maine in that a homeowner is entitled to recover the

difference between his cost in completing the house and the contract price.  A straight application of

that rule in this case, however, would leave Mr. Zamboni with no damages, since the $294,272.10

necessary to complete the house is less than the Purchase Price of $311,647.  This absurd outcome

underlines the danger inherent in strictly applying the law without considering the context in which

the analysis is performed.  In this case, Mr. Zamboni did not spend $294,272.10 to construct the

entire house; rather he spent that much to complete the remaining 30% of a $311,647 home.  Had Mr.

Zamboni paid Chase for the 70% of the home Chase completed before it walked off the job, he

would have spent a total of $512,425—70% of the Purchase Price ($218,152.90) plus what Mr.

Zamboni spent post-breach ($294,272.10)—to construct the same house.  It is this amount from

which the Purchase Price should be deducted.

As a result, the Court will award Mr. Zamboni $200,778 in damages to Mr. Zamboni on

Count I.[13]

B.   Damages Awarded to Mr. Zamboni on Count V (Violation of the UTPA)

A person who successfully establishes a violation of the UTPA may bring an action for actual

damages and restitution.  5 M.R.S. § 213(1).  Further, the Court shall award that party "reasonable

attorney's fees and costs incurred in connection" with that action.  5 M.R.S. § 213(2).  The

homeowner's recovery is limited, however, to the damages, fees and costs arising from the UTPA

violation.  See Sweet v. Breivogel, 201 A.3d 1215, 1221-22 (Me. 2019) (homeowners are limited to

recovery under the UTPA for money or property lost because of the UTPA violation); Parker v. Ayre,

---

[13] In other words, the damages are calculated by adding $218,152.90, or 70% of the Purchase Price, to $294,272.10, the cost to Mr. Zamboni to complete the remaining 30%, and then subtracting the Purchase Price of $311,647.

612 A.2d 1283, 1285 (Me. 1992) (same); Brace v. Ticomb, 2002 WL 1335871, at *3 (Me. Super.

May 17, 2002) (same); VanVoorhees v. Dodge, 679 A.2d 1077, 1082 (" . . . attorney fees are

recoverable pursuant to the UTPA only to the extent that the fees were earned pursuing a UTPA

claim") (citing William Mushero, Inc. v. Hull, 667 A.2d 853, 855 (Me. 1995)).

     The failure to provide an estimated date of completion led to confusion regarding the

expected construction timeline.  As a result of that confusion, Mr. Zamboni sold his apartment in

Portland well before the house was ultimately completed; resulting in rental, moving and storage

costs he could have avoided had he been provided with a more definitive and realistic completion

date.  As a result, the Court will award Mr. Zamboni $31,125 in damages resulting from Chase's

violation of the UTPA.

     C.    Award of Attorney's Fees to Mr. Zamboni

     As the prevailing party on his UTPA claim and Chase's PPA claim, Mr. Zamboni seeks

attorney's fees and costs and requests an opportunity to submit an affidavit in support of an award.

The Court will grant Mr. Zamboni that opportunity but reminds him that fees and costs awarded

under both the UTPA and PPA are limited to those incurred in connection with prosecuting or

defending against those claims.  See VanVoorhees v. Dodge, 679 A.2d 1077, 1082 (" . . . attorney fees

are recoverable pursuant to the UTPA only to the extent that the fees were earned pursuing a UTPA

claim") (citing William Mushero, Inc. v. Hull, 667 A.2d 853, 855 (Me. 1995)); Jenkins, Inc. v. Walsh

Bros., Inc., 776 A.2d 1229, 1239-40 (Me. 2001) (holding that party that prevailing on breach of

contract meruit claims not entitled to award of attorney fees under 10 M.R.S.A. §1118(4) unless the

trial court found on remand that it proved entitled to penalties under the PPA).  A large portion of the

fees and costs incurred in this case are directly attributable to Mr. Zamboni's claim for breach of

contract and the Court would expect the affidavit to reflect this fact.

D.    Damages Awarded to Chase on Count III (Quantum Meruit)

The Court hereby awards Chase the amount of $218,152.90 which represents 70% of the

construction contract.  Chase asserts that it spent $279,539 in materials and labor prior to walking off

the job but this figure is irrelevant.  As Mr. Zamboni points out, the construction contract is a fixed

price contract so the only amount Chase could collect if it had completed the contract,

notwithstanding any valid change orders, is the $311,647 Purchase Price.  That would be true

whether materials and labor cost Chase $200,000 or $500,000.  As Chase completed 70% of the

work, Chase is entitled to 70% of the Purchase Price.[14]

### V.    Conclusion

WHEREFORE, the Court will enter a separate judgment: (1) in favor of Mr. Zamboni on

Counts I, IV and V of his Complaint and award him damages in the amount of $231,903 plus

attorney fees and costs to be determined following submission of counsel's affidavit; and (2) in favor

of Chase on Count III of its Complaint with an award of $218,152.90 in damages.  Further, Chase

will be directed to discharge the Mortgage.


Dated:  February 13, 2025                          /s/ Peter G. Cary
                                                   Judge Peter G. Cary
                                                   United States Bankruptcy Court

---

[14] To the extent Mr. Zamboni argues that some of Chase's work was deficient in quality, the Court notes that the costs associated with repairing Chase's poor workmanship were sufficiently captured in Mr. Zamboni's award of damages for breach of contract.